[Civ. No. 588. Third Appellate District.—July 10, 1909.]

## STANDARD BOX COMPANY, Respondent, v. MUTUAL BISCUIT COMPANY, Appellant.

OPTION TO PURCHASE BOXES—NONACCEPTANCE WITHIN REASONABLE TIME.—A written option given by the plaintiff to the defendant to purchase boxes for the period of one year from a past date and including ten months from the date of the option does not give the defendant one year from the past date in which to accept the option; but to render the option binding it must be accepted within a reasonable time, and an acceptance on the last day limited for purchases is not within a reasonable time.

ID.—BELATED LETTER OF ACCEPTANCE INADMISSIBLE.—The letter of acceptance of the option sent after the lapse of a reasonable time was properly excluded from evidence as inadmissible.

ID.—OPTION SILENT AS TO TIME FOR ACCEPTANCE—REVOCATION.—An option to purchase which is silent as to the time for acceptance is a mere proposal, which is revoked by the lapse of a reasonable time without communication of acceptance.

ID.—EXTENT OF REASONABLE TIME A QUESTION OF LAW.—What is a reasonable time within which to accept an option to purchase is a question of law for the court. A year, or even six months, is an unreasonable time within which to accept an option to purchase personal property, as matter of law.

ID.—PAROL EVIDENCE INADMISSIBLE TO VARY TERMS OF WRITTEN OPTION.—Parol evidence was inadmissible to vary the terms of the written option, by proof of an oral agreement that defendant should have one year from the past date fixed in which to accept the same in writing. The reasonable time implied in the written option cannot be extended by parol evidence.

ID.—IMPLICATION OF LAW A PART OF PROPOSED CONTRACT.—That which is implied by law becomes as much a part of a proposed contract in writing as that which is therein written, and if the contract is clear and complete when aided by that which is imported into it by legal implication, it cannot be contradicted by parol evidence in respect of that which is implied, any more than with respect to that which is written.

ID.—ORAL AGREEMENT ALLEGED NOT AN EXECUTED CONTRACT.—The oral agreement alleged cannot be deemed an executed contract modifying the written proposal, within the meaning of section 1608 of the Civil Code.

ID.—NEGOTIATIONS NOT WRITTEN INADMISSIBLE—TIME FOR PERFORMANCE—REASONABLE TIME.—The rule that prior or contemporaneous

negotiations cannot be used to contradict, add to or vary a written contract, applies not only to the letter of the written document, but also to its legal effect; and when no time for performance is fixed, the law implies that a reasonable time is given, and evidence that a specific time had been agreed upon is inadmissible.

ID.—ACTION BY PLAINTIFF FOR GOODS SOLD—COUNTERCLAIMS FOR BREACH OF ACCEPTED OPTION—PROPER JUDGMENT.—In an action by plaintiff for goods sold and delivered to defendant under a prior written contract, where the defendant counterclaimed damages for breach of the alleged accepted option, by having to pay a higher market price than the agreed price set forth in the option, it being matter of law that the option was not accepted within a reasonable time and was revoked, judgment was properly rendered for the goods sold, and against defendant upon the counterclaims alleged.

ID.—ABSENCE OF CONTRACT RELATION—HIGHER MARKET PRICE DEMANDED BY PLAINTIFF—PAYMENT VOLUNTARY.—There being an entire absence of contract relation between the plaintiff and defendant, after expiration of the prior contract, there was no duress of the plaintiff in requiring payment of a higher market price as a condition of sales of boxes to defendant, and his being compelled to pay a higher market price to the plaintiff or to other parties was voluntary, on the part of defendants, and could be no basis of counterclaims against the plaintiff.

ID.—DURESS NOT ESTABLISHED.—An averment in some of the counterclaims that defendant could not obtain boxes elsewhere than from the plaintiff does not establish duress, where it is shown that plaintiff demanded only the usual market price as a condition of sales made to the defendant the same as to other customers of the plaintiff, there being no right of the defendant to demand any other than the usual market price of boxes from the plaintiff.

ID.—REFUSAL TO SELL MORE GOODS WITHOUT PAYMENT FOR GOODS SOLD. The refusal of the plaintiff to sell more boxes without payment for the boxes already sold was not unlawful, but was an act of common business prudence.

APPEAL from an order of the Superior Court of the City and County of San Francisco denying a new trial. George A. Sturtevant, Judge.

The facts are stated in the opinion of the court.

Sullivan & Sullivan, and Theo. J. Roche, for Appellant.

P. L. Benjamin, for Respondent.

CHIPMAN, P. J.—Action for goods, wares and merchandise sold and delivered to defendant by plaintiff. The cause was tried by a jury and plaintiff had the verdict for $1,444.83, the amount claimed in the complaint. Defendant appeals from the order denying its motion for a new trial.

It appeared that defendant had been purchasing certain boxes, cases and trays from plaintiff for defendant's use in its business, during the year 1905, under a written agreement dated July 25, 1905. While this contract was in force, to wit, September 1, 1905, plaintiff addressed the following letter to defendant (Defendant's Exhibit No. 2): "Gentlemen: We hereby agree to give you an option from one year from July 25, 1906, to furnish boxes at the same price as agreed upon in contract entered into between the Mutual Biscuit Co. and Standard Box Company. We furthermore agree to allow discount of 19½% off said prices, as present in said contract."

On the same day defendant wrote plaintiff as follows (marked Defendant's Exhibit No. 3):

"Gentlemen: We are in receipt of your communication of this inst., containing option for the continuation of contract for one year from July 25, 1906, with same conditions, prices and discounts as at present."

It is not pretended that this last above letter was anything more than an acknowledgment of the receipt of plaintiff's letter. It is in no sense an acceptance of the option given defendant and may be dismissed from further consideration. By the earthquake and fire of April 18, 1906, the plant of defendant was destroyed and was not rebuilt until the latter part of August of that year. On July 25th defendant mailed the following letter to plaintiff bearing that date:

"Temporary Office Mutual Biscuit Co.
"72 Central Ave., San Francisco.
"July 25, 1906.

"Standard Box Co.,
"Beale & Bryant Sts., City.

"Gentlemen: In accordance with your contract letter of Sept. 1, 1905, we hereby accept the option therein, agreeing to purchase all of our boxes of you upon same terms and prices as in previous contract, 19½% discount off. This to

be in effect for one year from July 25, 1906, pursuant to contents of said letter.

"In a previous letter we stated that we would change our stamp, but this we have decided not to do for a while at least. You will please have delivered at factory anywhere from Aug. 20th to Sept. 1st, the following:

> 1000 of our ⅛ boxes
> 1000 "   "   ¼   "
>  500 "   "   ½ cases
>  500 "   "   full cases

To be delivered at our new factory at Stevenson, Crocker and Colton streets."

Coincidently with offering this letter in evidence defendant endeavored to prove that prior to, and at the time the option (Exhibit 2) was given, the plaintiff verbally agreed with defendant that defendant should have and was given to and including July 25, 1906, within which to accept said proposal or offer contained in said option, if defendant so desired. Objection was made by plaintiff to all such evidence and to the letter offered in evidence, as incompetent, immaterial and irrelevant; and also upon the ground that "the conversation sought to be proved was merged into the subsequently executed papers whatever those papers may have been; and upon the further ground that it is an attempt to vary a contract, which, if it exists, is in writing, and is required to be in writing by the statute of frauds." The court sustained the objection and neither the oral evidence nor the letter of July 25, 1906, was admitted.

It appeared that payment for the goods, the subject of the action, became due between October 13, 1906, and November 26, 1906; that the price to be paid was the usual market price prevailing at the time of delivery. Defendant claimed that if he had not been compelled to purchase the goods from plaintiff at the going prices and had not also been compelled to purchase from other box factories at advanced rates, the difference between the prices so paid by it and the prices mentioned in said option would be considerably in excess of the amount now claimed by plaintiff, and for this excess defendant asks judgment in its several counterclaims pleaded. Defendant does not claim that a contract arose by virtue alone of its written acceptance sent to plaintiff after the option

was given, but it is claimed that having been verbally told at the time that it would be allowed one year within which to inform plaintiff of its acceptance, it should have been permitted to make this proof, and that the court erred in refusing evidence of that fact. The question then is, Was it competent to prove by parol that defendant had one year within which to accept plaintiff's offer?

The option is silent as to the time of acceptance. It was but a proposal which is revoked by "the lapse of a reasonable time without communication of the acceptance." (Civ. Code, subd. 2, sec. 1587. See, also, 9 Cyc. 291; *Chicago & G. E. R. R. Co.* v. *Dane,* 43 N. Y. 240; 1 Page on Contract, sec. 38.)

What is a reasonable time is a question of law for the court. *Roberts* v. *Evans,* 43 Cal. 380, was the case of an offer to sell personal property, and it was said: "An offer to sell, where no time is given, must be accepted at once, or within a reasonable time thereafter. A year, or even six months, must be held, as a matter of law, to be an unreasonable time." In *Crossmore* v. *Page,* 73 Cal. 213, [2 Am. St. Rep. 789, 14 Pac. 787], a promissory note provided that default in payment of interest should work the immediate maturity of the note, at the option of the holder. A delay of seven months was held to be a waiver of the right to exercise the option, and that the holder must wait until another installment of interest became due. In the case, *Chicago etc. R. R. Co.* v. *Dane,* 43 N. Y. 240, four months was held not to be a reasonable time within which to accept the offer there involved.

The notice of acceptance here was given ten months after the offer, and, if that would matter, after conditions in San Francisco had so changed as to greatly increase the market value of the goods. We think the acceptance was not given within a reasonable time.

Nor do we think it was competent to show by parol testimony that at the time the option was given plaintiff agreed that defendant should have one year within which to accept it. It is a well-settled principle that that which is implied by law becomes as much a part of the contract as that which is therein written, and if the contract is clear and complete when aided by that which is imported into it by legal implication, it cannot be contradicted by parol in respect of that which is implied any more than in respect of that which

is written. In the present case the law required that the acceptance should be communicated to plaintiff within a reasonable time, and this reasonable time could not be extended by parol. The principle was stated by us in *Peterson* v. *Chaix*, 5 Cal. App. 525, [90 Pac. 948] : ''Where the contract appears to be merely an incomplete memorandum, or to be partly in writing or partly in parol, extrinsic evidence is admissible to show what the mutual stipulations were. But this is true only as to such matters concerning which the written memorandum is silent or as to which terms are used which import ambiguity or uncertainty—*i. e.,* which on their face admit of doubt as to what the parties meant by their use. There is another principle to be observed, namely, that whatever the law implies from a contract in writing is as much a part of the contract as that which is therein expressed; and to the extent that the contract, with that which the law implies, is clear, definite and complete, it cannot be added to, varied or contradicted by extrinsic evidence''; citing *Faulkner* v. *Smith Wallpaper Co.,* 88 Iowa, 169, [45 Am. St. Rep. 230, 55 N. W. 200]. In *Gardiner* v. *McDonogh,* 147 Cal. 313, [81 Pac. 964], the memorandum of sale of the goods did not state the time and place of delivery, and it was hence argued that the memorandum was incomplete. But the court held otherwise and that the provisions of the Civil Code, sections 1753, 1754, are deemed to be a part of the contract and supplied the missing provisions. The rule that prior or contemporaneous negotiations cannot be used to contradict, add to, or vary, a written contract, applies not only to the letter of the written document, but also to its legal effect, as, for example, where no time of performance is fixed, the law implies that a reasonable time is given, and evidence that a specific time had been agreed upon is inadmissible. (17 Cyc. 570; 2 Page on Contracts, sec. 1195; citing *Fisk* v. *Casey,* 119 Cal. 643, [51 Pac. 1077].) The principle was applied in the following among many other cases which I have examined: *Stone* v. *Harmon,* 31 Minn. 512, [19 N. W. 88]; *Liljengren F. & L. Co.* v. *Mead,* 42 Minn. 420, [44 N. W. 306]; *Irish* v. *Dean,* 39 Wis. 562; *Warren* v. *Wheeler,* 8 Met. 99; *Driver* v. *Ford,* 90 Ill. 598; *Smith* v. *Caro,* 9 Or. 284; *Boehm* v. *Lies,* 18 N. Y. Supp. 577; *Rodney* v. *Wilson,* 67 Mo. 123, [29 Am. Rep. 499]; *Doolittle* v. *Ferry,* 20 Kan. 230, [27

Am. Rep. 166]; *Charles* v. *Denis*, 42 Wis. 56, [24 Am. Rep. 383]; *Stack* v. *Beach*, 74 Ind. 571, [39 Am. Rep. 113]; *Bryan* v. *Duff*, 12 Wash. 233, [50 Am. St. Rep. 889, 40 Pac. 936]; *Skelton* v. *Dustin*, 92 Ill. 52; *Martin* v. *Cole*, 104 U. S. 38; *Allen* v. *Chambers*, 13 Wash. 333, [43 Pac. 57].

Certain decisions of our supreme court are cited as establishing a contrary rule to that we have given. In *Wangenheim* v. *Graham*, 39 Cal. 169, it was held that the time for the performance of a simple contract in writing may be waived, or extended, by subsequent oral agreement. But it was pointed out in *Henehan* v. *Hart*, 127 Cal. 656, [60 Pac. 426], that the Wangenheim case was decided prior to the amendment of section 1698 of the Civil Code, and that the rule laid down in that case is not now the law. *Henehan* v. *Hart*, 127 Cal. 656, [60 Pac. 426], was followed in *Harloe* v. *Lambie*, 132 Cal. 136, [64 Pac. 88]; see, also, *Muller* v. *Swanton*, 140 Cal. 249, [73 Pac. 994].

Appellant relies with much confidence upon *Sivers* v. *Sivers*, 97 Cal. 518, [32 Pac. 571], and subsequent cases in which it is cited. In the Sivers case the written agreement was to pay $300 loaned "or any further sum of money which he may loan us at such time as circumstances may occur," and if not paid within a certain time (five years), the signers agreed to give a mortgage as security upon certain described land. As conclusion of law the court found that no time of payment being specified the obligation became due on demand. It was alleged in the complaint and found by the court that at the time the agreement was entered into, it was orally agreed that defendants should pay the sum named in the instrument "whenever they should sell the real estate described, and that such sale had been made prior to the plaintiff's demand and the commencement of the action." It was objected that oral proof of this written agreement was incompetent, as the written agreement must be held to embrace all the terms of the agreement between the parties. It was said on appeal: "The instrument, therefore, being silent in respect of the time for the payment of the money, it was competent for the plaintiff to show that a period or event had been agreed upon between the parties thereto at which payment should be made, and such agreement could be shown by oral testimony. This evidence did not contradict or vary any

of the terms in the instrument. The rule which excludes evidence affecting the terms of a written instrument does not apply . . . when the evidence is not inconsistent with the terms embodied in the instrument." (Citing *Guidery* v. *Green*, 95 Cal. 630, [30 Pac. 786].) "Inasmuch, therefore, as the instrument does not specify any time for its performance, the finding of the court that the money therein named became payable immediately upon the demand therefor was correct (Civ. Code, sec. 1657); and the further findings respecting the foregoing oral agreement did not prejudice the appellant. If the money was payable immediately on demand, they were not prejudiced by the fact that the demand was not made until after they had sold the property, or by the fact that it had been agreed that a demand should not be made until after such sale." It must be admitted that some expressions in the opinion would seem to be at variance with what may safely be said to be the universal rule as we have given it. We do not think the writer of the opinion, or the court in adopting it, intended to establish a rule so greatly different from that prevailing generally in this country and in England. We think the rule there laid down was with reference to what was regarded as a collateral agreement upon which the instrument was silent, and all the authorities hold that such an agreement does not vary the written instrument and may be shown by parol. The writer of the opinion in the Sivers case also wrote the opinion in *Savings Bank* v. *Ashbury*, 117 Cal. 96, [48 Pac. 1081], and he cited the Sivers case as applying to a collateral agreement. The Sivers case was cited in *Bradford Investment Co.* v. *Joost*, 117 Cal. 204, [48 Pac. 1083], but was distinguished, and was not followed because not applicable. In *Board of Education* v. *Grant*, 118 Cal. 39, [50 Pac. 5], the Sivers case is referred to, and it was pretty broadly hinted that so much of the opinion as held that where the written agreement mentioned no time of payment, evidence of a contemporaneous oral agreement was admissible, must be considered as *dictum*. In *Wolters* v. *King*, 119 Cal. 172, [51 Pac. 35], the defendants were to be paid in lumber for certain land which they sold, as plaintiff's agents, to the Red Cross Lumber Company. Defendants were to receive all the lumber in payment for the land and were to be paid their commissions also out of the

10 Cal. App.—48

lumber. They claimed the right, under section 1657, Civil Code, to appropriate the first lumber delivered as commissions, but evidence was admitted that, at the time the contracts were entered into, it was orally agreed that the commissions were not to be paid until all the lumber was delivered. This evidence was held admissible. In *Richter* v. *Union Land Co.*, 129 Cal. 367, [62 Pac. 39], the circumstances were peculiar to that case, and the oral agreements were held admissible under section 1856, Code of Civil Procedure. In *Williams* v. *Ashurst Oil Co.*, 144 Cal. 619, [78 Pac. 28], all that was there held on the point was that as the writing did not show on its face what shares of stock were meant by the writing, "parol evidence is admissible to show other conditions or explain latent ambiguities." But we have seen that where the law fixes the time of performance, parol evidence of some other definite time is inadmissible as varying the written instrument. In *Pierce* v. *Edwards*, 150 Cal. 650, [89 Pac. 600], the Sivers case is again cited, but to the point that oral stipulations sought to be proved are not inconsistent with the terms embraced in the writing. But the law in the present case completed the agreement by clearly implied terms which could not, under the settled rule, be changed by parol. The last case in which reference is made to the Sivers case is *Germain Fruit Co.* v. *Armsby Co.*, 153 Cal. 585, [96 Pac. 319]. The contract there was in writing, by which defendant sold to plaintiff certain "five hundred boxes apricots, more or less," designated by lots A, B, etc. The question was whether evidence was admissible to show a sale by samples, and hence a warranty of quality. It was held inadmissible. It was said: "If it [the writing] imports on its face to be a complete expression of the whole agreement—that is, contains such language as imports a complete legal obligation—it is to be presumed that the parties have introduced into it every material item and term; and parol evidence cannot be admitted to add another term to the agreement, although the writing contains nothing on the particular [matter] to which parol evidence is directed. The rule forbids to add by parol when the writing is silent, as well as to vary where it speaks." Citing *Harrison* v. *McCormick*, 89 Cal. 327, [23 Am. St. Rep. 469, 26 Pac. 830], from which the quotation is taken. The court said further: "To hold par-

ties to diligence and care in reducing their negotiations to writing, and to hold the writing to be subject to attack only by specific allegations of fraud or mistake, appears to be the better rule, and is now supported by the weight of authority. Like the statute of frauds, this rule is founded upon the long and convincing experience that written evidence is more certain and accurate than 'slippery memory.' So long as the rule is applied, the actual contract made can be preserved without fear of its being affected in its terms by the frailties of an interested human recollection. That sometimes the written contract does not include all the terms intended by reason of neglect or oversight, and injustice thereby done in particular cases, does not justify the abandonment of the rule. To construe it away is to destroy one of the greatest barriers against fraud and perjury."

Appellant cites numerous cases from other jurisdictions holding that evidence of a subsequent parol agreement may be given extending the time of performance, but obviously they have no application here, for the Civil Code, section 1698, provides that "a contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise." The claim that the alleged oral agreement was an executed agreement within the meaning of section 1698, Civil Code, is without merit. (*Platt* v. *Butcher,* 112 Cal. 634, [44 Pac. 1060]; *Mackinzie* v. *Hodgkin,* 126 Cal. 598, [77 Am. St. Rep. 209, 59 Pac. 36]; *Henehan* v. *Hart,* 127 Cal. 656, [60 Pac. 426]; *Harloe* v. *Lambie,* 132 Cal. 133, [64 Pac. 88].)

In its reply brief defendant devotes much attention to its counterclaims which it seeks to support because, as is alleged, its purchases and payments were "at prices higher than the contract rates," and "were compulsory, involuntary and under protest." After alleging the prices as provided for in the alleged contract, the first two counterclaims rest substantially upon the following averments: That defendant was engaged in the business of manufacturing and selling breadstuffs, crackers and biscuits; that by reason of the earthquake and fire of April 18, 1906, its plant was destroyed as were also "a large number of plants located in San Francisco wherein were manufactured boxes, cases," etc., in which defendant packed its articles of manufacture; that by reason thereof "it was practically impossible for said defendant to

procure or purchase from any person, firm or corporation, other than plaintiff, the boxes . . . required by it in its said business, or any large portion of the same, and without such boxes . . . it would have been impossible for defendant to have continued in its said business, all of which was known to said plaintiff,'' which, as is alleged, would have resulted in defendant's great financial loss and the loss of its business; that on various occasions between September 19, 1906, and December 21, 1906, plaintiff, ''taking advantage of the distressed condition of defendant and its necessities, wrongfully demanded amounts of money aggregating $2,843.39 in payment of said boxes . . . so furnished to defendant, although the agreed price . . . was and is the sum of $1,628.27 and threatened defendant that if it refused to pay said sums, aggregating $2,843.39, said plaintiff would refuse to furnish said defendant any further boxes,'' etc.

A second counterclaim of $905.18 consists of a discount of nineteen and one-half per cent upon certain boxes, trays, etc., and in addition to those mentioned as constituting the first counterclaim, being the same boxes, etc., as are referred to in plaintiff's complaint, and it is claimed that this amount should be allowed defendant under the terms of the alleged contract.

As a third counterclaim, it is alleged that between December 2, 1906, and January 27, 1907, ''plaintiff wrongfully refused to furnish said boxes, trays and extra tops or any portion thereof, pursuant to the terms of said contract, . . . denied that it was any longer in force or effect, and denied that it was under any obligation or liability whatever to comply with the terms, or any term of said contract, or to furnish defendant with any of said boxes, cases, trays or extra tops,'' by reason whereof ''defendant was compelled to and did purchase the same from other plants in the city and county of San Francisco, paying therefor the sum of $1,959.84, being $873.30 in excess of the price which plaintiff agreed to furnish to defendant said boxes . . . pursuant to the terms of said contract,'' and that said sum of $1,959.84 ''was the least amount for which said boxes . . . could be purchased by defendant.''

A fourth counterclaim is set forth based upon like averments and averring that between January 25, 1907, and July

25, 1907, by reason of plaintiff's refusal to comply with said alleged contract, defendant was compelled to purchase elsewhere in San Francisco articles which cost defendant $6,573.22, being $3,369.42 in excess of the prices at which plaintiff agreed to purchase the same.

It will be observed that the counterclaims, except the two arising out of purchases made from plaintiff prior to December 2, 1906, are for articles purchased from factories in San Francisco, other than plaintiff's. It is nowhere alleged in the answer that defendant was at any time compelled to pay either to plaintiff or any other factory more than the market rates existing at that time, or that the prices charged were exorbitant or oppressive, and a comparison of the prices paid to outside parties by defendant, as appears by the answer, will show them to have been quite as high as, if not higher, than those paid to plaintiff. The evidence was that upon being told by plaintiff that it would have to pay the current market rates, paid by all others, defendant objected and claimed that it should be supplied at the contract rates contemplated in the option; that plaintiff denied that any contract existed, and refused to furnish any boxes to defendant except at market rates, whereupon defendant accepted the goods upon plaintiff's terms, and paid the earlier bills as rendered by plaintiff without objection or protest. Later in their dealings, when there became due certain bills, about November 26, 1906, amounting to the sum named in the complaint, defendant refused payment, and this suit was brought on December 8, 1906. The third and fourth counterclaims are based wholly upon plaintiff's refusal to comply with the alleged contract, whereby defendant was compelled to purchase its supplies elsewhere, and both of these counterclaims accrued after this suit was brought. As plaintiff was under no obligation to provide boxes to defendant under the alleged contract, its proposal never in fact having ripened into a contract, it is obvious that these particular claims are groundless. Plaintiff had a right to refuse to deliver boxes when demanded by defendant at times and at prices to which plaintiff had never agreed. No issue of duress or compulsion is involved in these items of the counterclaims, and they may be dismissed from further consideration. They rest entirely upon breach of an alleged contract having no existence.

Defendant offered to prove all the allegations contained in its first and second counterclaims. Plaintiff's counsel consented that the offer might be made in that way, but objected to the evidence as incompetent, irrelevant and immaterial. The objection was sustained and defendant took an exception.

It is not claimed by defendant that it offered to or could prove any facts showing duress other than as alleged in the answer. Is sufficient there set forth to constitute what the law regards as duress?

Reduced to its essence, the answer shows that defendant was in great need of certain boxes, cases and trays with which to conduct its business of making and marketing biscuits; that it was "practicably impossible" for defendant to purchase them elsewhere than of plaintiff; that defendant demanded of plaintiff that it furnish the articles under the alleged contract set out in the answer; that plaintiff denied the existence of any contract between the parties, and refused to sell defendant any of said articles at the alleged contract prices, and, taking advantage of defendant's "distressed condition," exacted a sum for said articles in excess of the prices fixed for the same in said alleged contract, and informed defendant that unless such sum was paid plaintiff "would refuse to furnish defendant any further boxes"; that these articles were essential to defendant if it was to continue business, without which "its business would have suffered irreparable loss by reason of defendant's inability to supply its customers with said bread-stuffs," all of which "was well known to plaintiff."

As there were no contract relations between plaintiff and defendant, by which defendant had any right to demand the merchandise, all considerations of contract obligations on the part of plaintiff must be eliminated from the case. When, therefore, defendant solicited the goods, it stood to plaintiff as a stranger seeking to make purchases. It was told the prices it must pay, and the evidence was, and it is not alleged otherwise, that these prices were the market rates charged to other customers. However pressing defendant's need, and whatever consequences to its trade should it fail to get the articles, plaintiff had a clear right to make its own prices, and having made them and defendant having accepted the goods under the agreement then made, its action, it seems to us, was

voluntary, as was its subsequent payment for the goods. Defendant, in fact, when its averments are reduced to their last analysis, alleged no more than that plaintiff refused to recognize the existence of any contract, demanded the current market prices, and that in order to secure the much needed articles defendant paid to plaintiff the higher price demanded. We fail to discover in the transaction the elements of duress. Section 1569 of the Civil Code defines duress as (1) the unlawful confinement of a person; (2) unlawful detention of the property of any such person; (3) confinement of such person, lawful in form but fraudulently obtained, etc. "Menace" is defined by section 1570, Civil Code, and consists of such duress as is specified in section 1569, subdivision 1 and 2; of unlawful and violent injury to the person and property of any such person or injury to his character. It is not possible to find any constituent of duress or menace as thus defined in any of the averments of the answer.

In the early case of *Brumagim* v. *Tillinghast,* 18 Cal. 265, 272, [79 Am. Dec. 176], the court considered quite fully what in law would constitute compulsion or coercion sufficient to render payments involuntary. Among other principles it was there affirmed that where a person, with full knowledge of all the circumstances, pays money voluntarily under claim of right, he shall not afterward recover back the money so paid, and, to avoid the application of this rule, it must appear that the party was compelled by duress of his person or goods to pay the same. This case was cited in the following cases: *Bucknall* v. *Story,* 46 Cal. 589, 598, [13 Am. Rep. 220]; *Wills* v. *Austin,* 53 Cal. 152; *Dear* v. *Varnum,* 80 Cal. 86, 89, [22 Pac. 76]. In *Holt* v. *Thomas,* 105 Cal. 273, [38 Pac. 891], it was held not legal duress to threaten to bring suit for the enforcement of a debt. The Brumagim case, *supra,* was approved in *Rooney* v. *Snow,* 131 Cal. 51, 54, [63 Pac. 155]. (See, also, *Huddleston* v. *Washington,* 136 Cal. 515, 519, [69 Pac. 146].) In *Dear* v. *Varnum, supra,* the court said: "In the absence of acts amounting to duress or coercion, the payment of the tax was voluntary; and the mere protest, made at the time of payment, does not divest it of its voluntary character." As was said in *Phelan* v. *San Francisco,* 120 Cal. 5, [52 Pac. 39], "There must be some compulsion or coercion which controls the conduct of the party

making the payment . . . some threatened exercise of power or authority over his person or property which can be avoided only by making the payment." In *Huddleston* v. *Washington,* 136 Cal. 515, 519, [69 Pac. 146], the court said: "A payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid." A threat to refuse performance of a contract cannot be made the predicate of legal duress. (9 Cyc. 448; *Taylor* v. *Ford,* 131 Cal. 440, [63 Pac. 770].) In *Sillman* v. *United States,* 101 U. S. 465, an oft-cited case, the question arose out of alleged compulsion in entering into new charter-parties. The court said: "There was no threat of injury to their persons or to their property, to avoid which it became necessary to execute new charter-parties. Nor were those charter-parties executed for the purpose nor as a means of obtaining possession of their property. They yielded to the threat or demand of the department solely because they required, or supposed they required, money for the conduct of their business or to meet their pecuniary obligations to others. Their duty, if they expected to rely upon the law for protection, was to disregard the threat of the department and apply to the courts for redress against its repudiation of a valid contract." In *Cable* v. *Foley,* 45 Minn. 421, [47 N. W. 1135], certain contracts were sought to be avoided as having been executed under duress. The evidence offered for that purpose, said the court, "amounted to no more than that the plaintiff, being without means to pay his men, the defendants refused to pay what was then due him, unless he executed the contracts. The mere threat to withhold from a party a legal right, which he has an adequate remedy to enforce, is not, in the eyes of the law, duress; certainly not such as will avoid the execution of a contract." Defendant's duty here was to seek aid of the courts to enforce his rights under the contract; he could not receive the goods under the terms upon which they were delivered, afterward pay for them, and then claim that the payment was compulsory and recover the difference between the price thus paid and the prices mentioned in the contract. The payment must be regarded as voluntary. (*Regan* v. *Baldwin,* 126 Mass. 485, [30 Am. Rep. 689].)

Appellant says that it seeks relief "on the line of the complaint" in *Rowland* v. *Watson,* 4 Cal. App. 476, [88 Pac.

495].   The circumstances there were very different from the facts here, and that case furnishes no guide for us here. *Burke* v. *Gould,* 105 Cal. 277, [38 Pac. 733], is cited.   Without stating the facts in that case, suffice it to quote from the opinion: "The unvarying principle of them all (the cited cases) is that, by the performance or threat to perform some unlawful act whereby plaintiff will suffer loss, the defendant has induced the plaintiff, under circumstances sufficient to control the action of a reasonable man, to pay money which he otherwise would not have paid."   The court then proceeds to show that all that defendant threatened was to foreclose the mortgage which plaintiff had executed, and that this was not an unlawful act; that it was the exercise of a right which the law conferred upon him and was neither in law nor in morals reprehensible.   We fail to see how this case can avail defendant.   Here there were no contractual relations, as we have held, and plaintiff did no more than to require defendant to pay for the merchandise its market value.   In refusing to sell more goods unless defendant would pay for what it had bought was but an act of common business prudence.   There was absolutely nothing unlawful in plaintiff's action in the matter.   *Robertson* v. *Frank Brothers Co.,* 132 U. S. 17, [10 Sup. Ct. 5], relied upon, was the case of a United States collector of revenue imposing certain illegal charges which the importer paid under protest in order to get possession of his goods, and the question was whether "the settlements made in pursuance of that demand of necessity were voluntary in such sense as to preclude the appellant from subsequently insisting on his statutory right."   Said the court: "The parties were not on equal terms.   The appellant had no choice.   The only alternative was to submit to an illegal exaction, or discontinue its business."   It was held that the payment was not "a voluntary act within the meaning of the maxim, *Volenti non fit injuria.*"   It will be observed that the exaction was illegal, and for this reason, and to get possession of his property, the law permitted the importer to save his business by paying the illegal dues without being penalized by the enforcement of the rule as to voluntary payments.   It is not necessary to further pursue the examination of the cases relied upon by defendant.   Conceding that the courts recognize what may be termed moral duress under some circumstances, there is always some element of

illegality in the demand complained of, some denial of a right, some unfounded claim, some extortion, as was said by Justice Cooley in *Hackley* v. *Headley,* 45 Mich. 569, [8 N. W. 511], ''as a condition to the exercise by the party of a legal right.'' Here defendant had no legal right to demand the goods at his own prices or at all, for that matter. On the contrary, plaintiff had the legal right to fix the price upon his own goods. It was no concern of plaintiff that defendant could not get the goods elsewhere; plaintiff was under no obligation to see that defendant's business was safeguarded. It is not pretended that defendant was treated differently from other customers of plaintiff's, or that more than market rates were charged for the goods, or that those rates were excessive or burdensome.

We do not deem it necessary to notice other points raised by defendant.

The order is affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 7, 1909.